IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEROME THEUS,

                Plaintiff,

        v.

LORA BLASIUS, SUSAN NYGREN
DEBBIE NUTTING and LISA BAKER,

                Defendants.

OPINION AND ORDER

14-cv-224-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEROME ANTHONY THEUS,

                Plaintiff,

        v.

TERESA WIEGAND, PAUL KEMPER and
MICHAEL HOWARD,

                Defendants.

OPINION AND ORDER

13-cv-681-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In these consolidated civil actions, pro se plaintiff Jerome Anthony Theus contends that he was denied medical care and subjected to unsanitary conditions in cell while he was a prisoner at the Racine Correctional Institution.  Both cases are before the court on a motion for summary judgment filed by defendants Lisa Baker, Lora Blasius, Debbie Nutting, Susan Nygren, Michael Howard, Paul Kemper and Teresa Wiegand.  Case no. 13-cv-681-

1

bbc, dkt. #64; case no. 14-cv-224-bbc, dkt. #58.  (I have corrected the spelling of the names of defendants Wiegand and Blasius and added the full names of defendants Howard, Kemper and Wiegand to the caption.)

Plaintiff has also renewed his request for assistance in recruiting counsel to help him litigate these two cases.  (Case no. 13-cv-681-bbc, dkts. ##80, 85; case no. 14-cv-224-bbc, dkts. ##74, 79.)  Because he has shown that he made sufficient efforts on his own to recruit counsel, the remaining question is whether the case exceeds his ability to litigate it on his own.  Pruitt v. Mote, 503 F.3d 647, 656 (7th Cir. 2007).  Although this case involves claims of inadequate care and such cases are often complex and in need of expert testimony, this is not one of those cases.  Dewitt v. Corizon, Inc., 760 F.3d 654, 658 (7th Cir. 2014) (some medical claims are "so complex and beyond the invidual's capacity as to warrant the recruitment of counsel," others are not); Romanelli v. Suliene, 615 F.3d 847, 852 (7th Cir. 2010) ("Because the court found that no exceptional circumstances existed that would merit appointment of counsel, it denied the motion.  We agree and conclude that the denial was reasonable.").  This case involves plaintiff's care over the two-year period in which he was confined at the Racine Correctional Institution.  Defendants proposed facts to support their version of the events of that two-year period; plaintiff's only job was to show that their version was not correct.  Although plaintiff failed to follow the court's procedures on summary judgment, it is possible to determine from his filings the objections he has to defendants' proposed findings of fact. With the exception of the summary judgment procedure, plaintiff has shown that he is capable of litigating his claims on his own, so his

motion to recruit counsel will be denied.  It was not necessary for him to show that a particular course of treatment or procedure was medically improper or not properly performed; his claims are  primarily that he was not given the precise medicines he wanted and that he was not given clean linens on request.  These are claims that do not require a lawyer's assistance or an expert medical witness.  Plaintiff has been complaining about them since he filed his first case on the subject on September 27, 2013.  Moreover, any concern he has that his allegedly substandard medical care will continue is now moot because he has been released from prison.  For these reasons, plaintiff's motion for assistance in the recruitment of counsel will be denied.

Defendants contend that they are entitled to summary judgment because plaintiff received prompt and consistent care for his medical problems, which included acid reflux disease and hypertension, and that any lapses in care or recurrent symptoms can be attributed to his refusal to follow treatment regimens and take advantage of diagnostic testing.  In addition, defendants say that any unsanitary conditions in plaintiff's cell were of his own making because he had the opportunity to wash his own linens or exchange them and declined to do so.

From the undisputed facts, I conclude that defendants have shown that they were not deliberately indifferent to plaintiff's medical needs or to any unsanitary conditions in his cell.  To the contrary, the evidence shows that defendants made extensive efforts to learn the reasons for plaintiff's medical problems and to treat those problems, despite plaintiff's refusal to cooperate with all of their efforts.   As to the conditions in plaintiff's cell, those were

3

within plaintiff's control and not the result of any action or failure to act on the part of any defendant.   Accordingly, summary judgment will be entered in defendants' favor.

From the parties' submissions, I find the following facts to be undisputed.

## UNDISPUTED FACTS

### A.  Background and Parties

Plaintiff Jerome Anthony Theus was a prisoner at the Racine Correctional Institution from July 2012, when he was transferred from the Dodge Correctional Institution to the Racine Correctional Institution, until September 2014.   After he arrived at Racine, the health services staff reviewed his medical reports and the files from Dodge, noting that plaintiff had been given two diagnoses, one of gastroesophogeal reflux disease, for which he was prescribed Prilosec (20 mg), and one of heartburn, for which he was prescribed Nifidepine ER (60 mg).   Health staff continued plaintiff's prescriptions upon his arrival at the Racine prison so that there was no interruption in his receipt of medicine.

Defendant Lora Blasius is an "advanced practice nurse prescriber" at the Racine prison.   She implements treatment plans for prisoners and prescribes or discontinues prisoners' medications.  Defendant Susan Nygren is an administrative manager of the health services unit at the Racine prison.  In that role, she does not provide direct care to prisoners but helps coordinate their care.  Defendants Debbie Nutting and Lisa Baker are nurses at the Racine prison; they do not have prescribing authority.   Defendant Paul Kemper is the warden at Racine.   He does not provide medical care to prisoners and he has no direct

involvement in decisions about their health, but he oversees the staff of the entire prison. Defendants Teresa Wiegand and Michael Howard are unit managers at the Racine prison; in that capacity, they oversee the security and general living conditions for the prisoners in their units and implement prison policies applicable to the unit and the individual prisoners.

## B.  Plaintiff's Acid Reflux Condition

Plaintiff's records from the Dodge Correctional Institution contained many references to times on which he had complained about throwing up blood and acid and about his treatment for those problems.  On June 25, 2012, shortly before his arrival at Racine, plaintiff had been sent to the Waupun Memorial Hospital, where he underwent an esophagogastroduodenoscopy to determine why he had been throwing up blood and acid. ( In this procedure, a doctor inserts an endoscope into the esophagus to examine it and other areas in the patient's digestive tract.)  Plaintiff reported having had surgery in 2007 to repair a hole in his esophagus, but the examining doctor at the Waupun Memorial Hospital did not find any evidence of that surgery, such as a scar.  He did find evidence of surgery for repairing an umbilical hernia, but he found most of plaintiff's anatomy to be in normal condition, except for a short segment of "significant distal esophagitis," indicating that a portion of plaintiff's esophagus was significantly inflamed.  The doctor recommended a proton pump inhibitor medicine.

On June 27, 2012, a different doctor had a followup appointment with plaintiff at the Dodge Correctional Institution.  He noted that plaintiff had esophagitis but no active

5

bleeding or ulcers and recommended that plaintiff remain on proton pump inhibitor medicine.   Plaintiff refused the generic proton pump inhibitors omeprazole and pantoprazole, along with other heartburn medicines such as Tums and Maalox, and demanded name-brand Prilosec, which is a proton pump inhibitor medicine.  The doctor at the Dodge prison made a special request that plaintiff receive the name-brand medicine "as a harm reduction maneuver"; this request was approved and plaintiff received a prescription for Prilosec twice a day.  Case no. 13-cv-681-bbc, dkt. #72, exh. #100 at 218, 329; case no. 14-cv-224, dkt. #66, exh. #100 at 218, 329.

Thereafter, plaintiff was seen at health services on six occasions in July 2012.  On July 20, he saw nurse Baker on July 20, 2012 for complaints of pain from his acid reflux symptoms; Baker suggested that he stop taking NSAIDs (nonsteroidal anti-inflammatory drugs) for pain management because they would aggravate his symptoms.   On July 22, 23 and 24, he complained of drooling blood and acid and gastrointestinal pain.   He was asked to provide a stool sample but declined.  He did accept an extra pillow from health services staff, which allowed him to elevate his head and neck when sleeping, thus alleviating his heartburn symptoms.  A nurse attempted to see plaintiff on July 25, 2012.  He refused initially but later the same day, he allowed the nurse to assess his abdomen by palpation. On July 27, he was seen at health services after reporting that he had vomited blood and found blood in his stool; his abdomen was soft but not distended or tender.  On July 30, 2012, he told health services that he continued to bleed from his mouth but that he no longer experienced pain from heartburn.  The staff tried to arrange for collection of a stool

6

sample, but he refused.  (He provided one at some later time.)  Nurse practitioner Blasius suggested a rectal exam, but he refused that as well.

Plaintiff came to health services on four occasions in August 2012.  On August 5, he reported more vomiting of blood, despite continuing to take Prilosec; on August 7, 2012, he had the same complaint.  After a visit on August 14, the staff placed him on a "bland diet" so that he would receive only those foods appropriate for his acid reflux symptoms.  On August 22, 2012, defendant Blasius ordered a colonoscopy to try to determine whether plaintiff's acid reflux symptoms could be related to other gastrointestinal problems.  She noted that his stool sample tested positive for blood but that his complete blood count had shown normal results.

Plaintiff came to health services twice in September 2012. On September 25, 2012, he complained of vomiting blood and was told that the next step was a colonoscopy to find an appropriate diagnosis; he refused and left.  On September 27, 2012, the nurse again told plaintiff that he was scheduled for a colonoscopy and that it was important for his care. Again, he refused.

Plaintiff saw health services six times in October.  He had appointments on on October 9 and 11, 2012.  On October 15, 2012, he refused nurse Baker's efforts to prepare him for a colonoscopy at the University of Wisconsin hospital.  Plaintiff came to appointments on October 17 and 22, but refused care because he had an upcoming appointment with nurse practitioner Blasius.  On October 31, 2012, he had an appointment with defendant Blasius and brought with him a cup of approximately one ounce of a red

liquid that he said was his bloody drool.  He complained that health services never did anything to help him.  Defendant Blasius offered to assess him and check his blood pressure, but he refused.  She asked why he refused a colonoscopy, but he did not answer and walked out.

Sometime in September or October 2012, staff observed plaintiff sleeping face down on his bed with no raised support, in contravention of directions from health services staff that he should sleep on his back with his head raised.  On November 4, 2012, defendant Blasius noted plaintiff's canteen orders, including items such as "Hot n Spicy Veg," "Chili Ramen Hot," "Hot Chile w/ Beans" and "Chili Cheese Corn Chips," that did not comply with the recommendations for a bland diet but did explain why he continued to experience acid reflux symptoms.

On November 7, 2012, defendant Nygren, along with the deputy warden, who is not a party, wrote to plaintiff, discussing his repeated refusals to accept treatment and diagnostic testing and noting his refusal to comply with his health providers' recommendations. Plaintiff saw health services four times that month.  On November 14, 2012, plaintiff refused a scheduled psychiatric evaluation for his multiple somatic complaints.   Later, the appointment was rescheduled, but plaintiff did not go to the appointment.  On November 15, 2012, plaintiff submitted two health services request forms; in one, he wrote that health services should not try to assist him ("thank you and please don't try to help me," case no. 13-cv-681-bbc, dkt. #72, exh. #100 at 76; case no. 14-cv-224, dkt. #66, exh. #100 at 76). On November 19, 2012, plaintiff was seen by health services about his complaints of knee

pain and throwing up blood but he refused an evaluation regarding the vomit.  Plaintiff was also seen on November 27 for his complaints of drooling blood, among other unrelated complaints, but the assessment was unremarkable.

Around this time, defendant Blasius met with defendant Nygren and another staff member, who is not a defendant, to discuss the handling of plaintiff's frequent complaints. After that meeting, defendant Blasius ordered the nurses to have a standing order to see plaintiff every two weeks to check his weight and vitals.  Defendants also say they "conduct[ed] a health maintenance check" during these visits; they do not explain what that means.  The parties do not say whether these standing appointments were maintained or, if so, for how long.  On December 16, 2012, plaintiff submitted a request to be seen by health services staff; defendant Nutting informed plaintiff that his concerns had already been addressed and that he would not be seen.

The Racine prison scheduled a psychiatry appointment for plaintiff on January 2, 2013, but he did not go to the appointment.  He had four other contacts with health services that month.  On January 3, he went to health services for preparation for his colonoscopy scheduled at the University of Wisconsin hospital.  On January 4, he refused the colonoscopy.  Although a health services staff member instructed plaintiff on the risks of refusing the colonoscopy and what the procedure entailed, plaintiff said he understood the procedure and the risks but did not wish to go through with the procedure.  On January 9 and 16, he saw heath services again for his acid reflux; nothing remarkable was found.

On February 6, 2013, defendant Blasius wrote to ask plaintiff whether he would agree

to have a colonoscopy.  It is not known whether he responded to this memorandum, but he sent request forms to health services on February 10, 13 and 16, stating that he was throwing up blood.  Because he did not ask to be seen, health services staff did not set up an appointment and told plaintiff to inform them of any changes in his condition.

Plaintiff did not complain about his acid reflux symptoms from February until April 28, 2013, when he submitted a health services request form saying that he had drooled blood and acid.  Again he did not ask to have an appointment, so none was made.  Defendant Nutting told plaintiff to inform health services staff of any changes.

Plaintiff saw health services on four occasions in May 2013.  On May 10, he saw Dr. Luy, who noted that plaintiff was taking omeprazole at 20 milligrams three times daily, with meals.  Luy told plaintiff that the medicine would be most effective on an empty stomach and prescribed it to be taken only twice daily, half an hour before breakfast and at bedtime. On May 14, plaintiff met with a nurse.  Plaintiff told the nurse that he had "paperwork" that said he should not take omeprazole, only Prilosec, and he refused the omeprazole he had been taking.  On May 20, plaintiff submitted a health services request, stating that had not taken Prilosec for nearly a month and that he required the medicine for his acid reflux disease, which was causing him to vomit, defecate and drool blood.   Nurse Nutting responded, explaining that omeprazole was "the same medication."  Case no. 13-cv-681-bbc, dkt. #72, exh. #100 at 158; case no. 14-cv-224, dkt. #66, exh. #100 at 158.  On May 21, plaintiff saw Dr. Luy again but only for concerns about his liver.  On May 31, plaintiff had an appointment with health services staff after he complained of vomiting twice daily and

10

finding blood in his vomit.  He also stated he was nauseated and had defecated blood.  The examining nurse wrote that plaintiff would be set up for an appointment with a doctor to determine whether a colonoscopy was appropriate.

Plaintiff saw health services on three occasions in June 2013.  On June 3, he complained that his acid reflux symptoms had worsened; health services staff scheduled an appointment with a doctor.  On June 4, he submitted another health services report in which he said he continued to throw up blood and acid.  Defendant Nutting did not schedule him an immediate appointment and told him to inform the health services unit of any changes.  On June 15, plaintiff submitted a health services request form, stating that he threw up blood and that correctional officers allowed him to sleep in the blood and acid.  On June 16, he had an appointment with health services staff and said he had vomited, but could not say when or how much.

On July 1, 2013, plaintiff had an appointment with Dr. Luy, who prescribed cetirizine to help control plaintiff's drooling.  On July 17, plaintiff again demanded Prilosec through a health services request form.  On July 19, defendant Nutting told plaintiff that Prilosec had been sent to him the day before.

On September 13 and 20, 2013, plaintiff was seen by health services for complaints of vomiting blood, among other things.  Defendant Blasius suggested a colonoscopy; this time, plaintiff agreed.

On October 21, 2013, plaintiff had a colonoscopy and upper endoscopy procedures at the University of Wisconsin Hospital.  The endoscopy revealed that plaintiff had

11

esophagitis (without bleeding) at the gastroesophageal junction where the esophagus and stomach join, as well as a large hiatal hernia, caused by his stomach pushing through part of his diaphragm. Plaintiff's stomach and duodenum showed signs of inflammation in the form of erosions and reddening. Biopsies were taken from areas of inflammation or concern and were tested for H. pylori, with negative results. The physician noted that the various areas of inflammation and the hernia likely explained plaintiff's symptoms. Plaintiff's colonoscopy was normal, although his bowel preparation was unsatisfactory. The physician recommended that plaintiff continue on proton pump inhibitors or acid-blocking medicine twice a day and avoid NSAIDs. He stated that if plaintiff's symptoms persisted, a consultation with a gastrointestinal specialist may be advisable. On October 25, defendant Blasius order the discontinuation of plaintiff's Ibuprofen and Excedrin and ordered him to take 20 milligrams of Prilosec twice a day for six months. On October 29, when defendant Blasius saw plaintiff for his complaints of acid reflux symptoms, he reported that his medicine was not working. She encouraged him to follow his diet regimen, sleep with an extra pillow, avoid lying down after eating and continue his medicine.

On November 7 and 10, 2013, plaintiff submitted health service request forms complaining of acid reflux symptoms. On November 11, he submitted another and stated that he "need[ed] the surgery." Case no. 13-cv-681-bbc, dkt. #72, exh. #100 at 145; case no. 14-cv-224, dkt. #66, exh. #100 at 145. On November 14, he saw health services staff and he informed a nurse that he was no longer taking his medicine. The nurse instructed him to take his medicine as ordered and scheduled an appointment for plaintiff to see the

nurse practitioner on December 10.  Plaintiff submitted health service request forms on November 20 and 21, complaining of abdominal pain and drooling blood and acid.  Health services staff saw plaintiff on November 27; he said again that he had stopped taking Prilosec on October 29.  Plaintiff said he did not understand why he was being seen by a nurse at all; she explained that it was because he had submitted the health service request forms.  He stated he wished to be seen by a doctor.  On November 30, he submitted a health services request form, asking for Nexium in place of Prilosec.

On December 5, 2013, plaintiff saw nurse Baker, complaining of stomach pain and drooling.  He stated he felt sharp pain only when lying down but that his pain was constant; he reported no changes in bowel or bladder habits.  On December 10, he was scheduled to see defendant Blasius, but he did not come to his appointment.  Nurse practitioner Blasius wrote plaintiff, explaining that she was aware of his refusal of medicine and that he should visit her so that she could reevaluate his stomach condition.  On December 18, he saw health services staff for an unrelated complaint.  The staff member told plaintiff that he should take Prilosec and that he must do so for two consecutive months before he could expect to see results.  Defendant Blasius was scheduled to see plaintiff on December 20, but she was ill that day.  On December 26 and December 30, plaintiff refused to be seen by health services staff.

In January 2014, plaintiff refused to go to two scheduled appointments with defendant Blasius on January 20 and 22.  On January 30 and February 16, plaintiff submitted additional health services request forms complaining of heartburn symptoms.  On

February 25, plaintiff had an appointment scheduled with defendant Blasius; again, he did not keep the appointment. Defendant Blasius scheduled a followup appointment for two months later.

On March 11, 2014, defendant Blasius continued plaintiff's prescription for omeprazole, despite his inconsistent refills, because she believed it was the most effective medicine for him. On March 25, plaintiff saw health services staff for an unrelated matter. He stated he was not in pain but that he wanted Nexium for his acid reflux. The staff member who saw him noted that he had a history of storing Nexium bottles in his bunk.

On April 16, 2014, plaintiff complained of acid reflux symptoms and said he needed to go to the hospital. On April 23, he saw defendant Blasius and reported again that he was not taking his medicine. Blasius told plaintiff she would request Nexium for him and that she would follow up with testing in four to six months. In addition, she discontinued his prescription for omeprazole and ordered sucralfate, which is a medicine used to treat ulcers, acid reflux and related problems. On April 24 and 27, plaintiff submitted health services request forms complaining that staff had ordered generic medicine rather than name-brand medicine. On April 28, plaintiff submitted a health services request form in which he said he needed to go to the hospital from his acid reflux symptoms.

On May 1, 2014, plaintiff demanded name-brand Prilosec and said he had used sucralfate in the past without success. On May 5, he submitted another request related to acid reflux symptoms. On May 12, health services staff saw plaintiff but he refused an assessment. Plaintiff submitted requests on May 13, 15 and 16, stating that he needed to

14

go to the hospital for acid reflux, and another one on May 22, complaining of drooling blood and acid. On May 23, he submitted an information request form, asking to receive Prilosec. On May 27, defendant Nygren wrote plaintiff, explaining that his plan of care was in line with the recommendations of the doctor at the University of Wisconsin Hospital, Dr. Luy and defendant Blasius. Nygren added that "if [plaintiff] follow[ed] the plan of care and t[ook] the medication as ordered, the prognosis [wa]s quite favorable for relief of abdominal discomfort. There [wa]s nothing that indicate[d] the need for further outside consultation." Case no. 13-cv-681-bbc, dkt. #72, exh. #100 at 109; case no. 14-cv-224, dkt. #66, exh. #100 at 109.

On June 4, plaintiff submitted another request to be seen for acid reflux, but on June 5, he refused to be seen by health services. On June 29 he requested name-brand Nexium. He did so again on and July 31, 2014.

On August 7, 2014, plaintiff saw health services staff and he told the nurse that he was "allergic" to generic medicine. On August 14, he submitted a health services request, complaining of drooling blood and acid. On August 18, he saw health services staff. He told them he was not taking antacids or sucralfate and he insisted on receiving name-brand omeprazole. On August 23, he saw defendant Blasius and insisted on receiving Nexium. She told him she would order omeprazole for him.

On September 12 and 14, 2014, plaintiff submitted additional health service requests, complaining of acid reflux symptoms. He saw health services again on September 19. He was transferred to the Fox Lake Correctional Institution later that month.

C. <u>Hypertension</u>

Before plaintiff arrived at the Racine prison, he was given a diagnosis of hypertension. Ten days before he left Dodge Correctional Institution, a doctor there prescribed 60 mg extended release Nifedipine to treat his hypertension. Sometime after his arrival, medical staff at the Racine prison increased his dosage to 90 mg. Nifedipine was one of the medicines plaintiff took most consistently during his time at Racine. In May 2013, Dr. Luy prescribed Metoprolol to treat plaintiff's blood pressure. During the two years that plaintiff was at Racine, defendants reported checking plaintiff's blood pressure at least 35 times and may have done so even more often. His blood pressure readings varied between 155/106 at the high end and 110/67 at the low end.

Plaintiff did not complain of any symptoms related to his high blood pressure, except that he said he had migraine headaches, which he attributed to his high blood pressure. The parties do not say whether plaintiff's migraines were related to his blood pressure. Plaintiff complained six times of headaches before May 10, 2013, when Dr. Luy prescribed Excedrin. Before that, plaintiff took Ibuprofen for his headaches. On July 1, 2013, after plaintiff had complained two more times, Dr. Luy prescribed Imitrex for him. Blasius discontinued that prescription in September because plaintiff told her it did not work; in October, she discontinued his Excedrin and Ibuprofen because they are NSAIDs and his medical care providers believed that they were aggravating his acid reflux disease.

Health services staff recorded several times that plaintiff's blood pressure was elevated (e.g., September 25, 2012; January 23, 2013; February 24, 2013; November 14, 2013;

16

March 25, 2014; May 1, 2014; and September 19, 2014).  With each instance, except in January 2013, plaintiff was scheduled for a followup evaluation.  On September 26, 2012 and March 25, 2014, the evaluations showed that his blood pressure was stabilized.  On February 25, 2013, notes in plaintiff's file suggest that a member of the health services staff saw him.  The  parties do not say how the staff member assessed plaintiff or what she concluded.  In November 2013, plaintiff had stopped taking his medicine as prescribed.  In May 2014, plaintiff refused to be seen for his followup evaluation.  During a September 2014 appointment, the nurse determined that any action should wait for plaintiff's scheduled visit with the nurse practitioner who had been tracking his vital signs routinely. She also explained to plaintiff that he should decrease his intake of salty foods and exercise regularly.  After September 2014, plaintiff was moved to a new prison.

Plaintiff expressed concern that health services staff were changing his blood pressure readings in his file; the staff member explained to him that there were no signs in the file that any one had erased, crossed out or otherwise had had any changes to the initial documentation.

### D.  Soiled Linens

At the Racine Prison, all new prisoners are provided a handbook, which includes details on the procedures for receiving fresh linens and washing linens and clothes.  Plaintiff received this handbook.  Under the prison's policy, prisoners may exchange their dirty linens for clean ones once per week in the "day room" for each unit.  In order to receive clean

linens, prisoners must hand over their dirty linens.  Twice a week, prisoners may exchange dirty laundry and towels for clean ones.  Only state-issued items may be included in the exchange (that is, clothing that is the prisoner's personal property may not be put in the laundry exchange).  Prisoners are not required to participate in the exchange.  It is the prisoner's responsibility to be present and to put his dirty laundry in the exchange.

Each wing of both plaintiff's housing units has two washing machines in which prisoners may wash laundry on their own; two dryers are also available on each unit for prisoner use.  Until November 2013, prisoners had to purchase laundry tokens from the canteen; after that, use of the machines was free.  However, prisoners must purchase detergent from the canteen for washing laundry in the unit washing machines.  The laundry rooms include sinks with free soap that may be used for hand-washing laundry.

Under prison rules, prisoners are issued the following linen and are not allowed to possess more unless given a specific exemption:  one blue bedspread, two sheets, one pillow case, one white blanket (two in winter) and two towels.  In addition, prisoners may purchase two extra towels from the canteen for any reason.  These towels are not part of the "exchange"; prisoners must wash them on their own.  Plaintiff was given exemptions for medical reasons during the following time periods:  one extra bath towel from July 30, 2012 to January 10, 2013 and from February 25, 2013 to February 25, 2014 and one extra bath towel plus two extra wash cloths from January 16, 2014 to January 16, 2015 and from June 11, 2014 to January 16, 2015.

In September 2012, plaintiff filed a grievance in which he complained that he was not

receiving clean linens in his cell.  Defendant Wiegand, the unit manager on the Washington Unit where plaintiff was housed, explained to plaintiff that he had not asked staff for clean linens and that he should try to position himself in such a way to avoid soiling his linens in his sleep.  Defendant Wiegand's staff told her that, later, plaintiff asked them for new linens but refused to return his soiled linens when he received clean ones.  Other inmates complained of the excess dirty linens in plaintiff's cell.  Plaintiff never asked defendant Wiegand personally for clean linens.  (Plaintiff alleges that defendant Wiegand sent an email telling her staff not to give him clean linens, but in a grievance attached to his summary judgment materials he said that defendant Wiegand had told her staff not to give him clean linens because he needed to wash the linens he had.)

In July 2013, plaintiff was moved to the Kenosha Unit at Racine, which was managed by defendant Howard, who decided that plaintiff would not be allowed to exchange linens whenever he wanted to, but would be required to exchange them only during the normal exchange times.  When plaintiff asked for towels in addition to the three he was permitted in August 2013, defendant Howard refused because plaintiff wanted to spit his bloody vomit into them. Defendant Howard believed a better and more sanitary way for plaintiff to handle the problem was to spit into the toilet or sink in his cell.  Plaintiff told defendant Howard that it would be too much effort and that it was unreasonable to tell him to go to his toilet in order to spit.

At some time during plaintiff's stay on the Kenosha Unit, defendant Howard observed seven or eight towels in plaintiff's cell.  He found that some appeared to have a clear

19

substance (such as spit or even bile) on them but they were not bloody.  Defendant Howard told plaintiff he would be disciplined for keeping excessive dirty linens in his cell.   (The record does not disclose whether this ever happened.  Plaintiff also says defendant Howard told him that he would have to pay for linens he soiled but he does not say that Howard followed through on this threat.)  Plaintiff never asked defendant Howard personally for clean linens.


OPINION

A.  Medical Care:  Acid Reflux Disease

Plaintiff contends that defendants Paul Kemper, Lora Blasius and Susan Nygren violated the Eighth Amendment when they failed to properly treat his acid reflux disease. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 172 (1976)).  A serious medical need includes "a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."  Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010).  The Court of Appeals for the Seventh Circuit has recognized that acid reflux (or GERD) may be considered a serious medical condition and the parties do not argue otherwise.  Rowe v. Gibson,— F.3d — , No. 14-3316, 2015 WL 4934970, at *6 (7th Cir. Aug. 19, 2015); Miller v. Campanella, —  F.3d —, No. 14-1990, 2015 WL 4523799, at *2 (7th Cir. July 27, 2015) (Acid reflux can "produce persistent, agonizing pain[,] . . . discomfort

20

. . . [and] 'serious complications.'").  Thus, the question is whether defendants exhibited deliberate indifference to plaintiff's acid reflux.

Under the "deliberate indifference" standard, a plaintiff must show that the defendants knew of his serious medical condition and acted with reckless disregard to the risk that the condition posed to the plaintiff.  Perez v. Fenoglio, — F.3d — No. 12-3084, 2015 WL 4092294, at *3 (7th Cir. July 7, 2015) ("The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard.").  "Prolonged and unnecessary pain resulting from a significant delay in effective medical treatment may support a claim of deliberate indifference. . . .  But disagreement with a doctor's medical judgment is not enough to prove deliberate indifference."  Petties v. Carter, — F.3d — No. 14-2674, 2015 WL 4567899, at *3 (7th Cir. July 30, 2015) (citations omitted).

As an initial matter, defendants Nygren and Kemper did not provide direct care to plaintiff; rather, they held supervisory positions in the health services unit and the prison, respectively.  Although plaintiff alleged in his complaint that these defendants did not permit him to go to the hospital, he has not disputed defendants' evidence that defendant Kemper did not play any role in such decisions and that plaintiff did not exhibit emergency symptoms that would have required a visit to the hospital.  King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012 ("[N]onmedical officers may be found deliberately indifferent [only] if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'") (quoting Hayes v. Snyder, 546 F.3d 516, 527 (7th

21

Cir. 2008)); <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1015 (7th Cir. 2006) ("[Healthcare Administrator defendant] took [plaintiff's] condition seriously, investigated the situation, referred [plaintiff] to a doctor, and reasonably relied on the doctors' professional opinions."). Accordingly, summary judgment must be entered in favor of defendants Nygren and Kemper.

As to nurses Baker and Nutting, the facts do not reveal that they declined to provide medical care to plaintiff when they were in a position to do so. Plaintiff saw these two defendants on a number of occasions, but he has not identified any failure on their part to administer care to him or any occasion on which they provided substandard care.

The remaining health care professional is nurse practitioner Blasius. Under <u>King</u>, 680 F.3d at 1018-19, "[t]he standard for deliberate indifference is different for the medical staff. A medical professional's deliberate indifference may be inferred when 'the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" (quoting <u>Estate of Cole by Pardue v. Fromm</u>, 94 F.3d 254, 261–62 (7th Cir. 1996)). Over the course of the two years that plaintiff stayed at the Racine prison, heath services staff saw plaintiff no fewer than 45 times for his complaints of acid reflux. On almost every occasion on which plaintiff asked for an appointment, he was seen; in addition, he was seen on a routine basis simply because he complained so often about his health problems and his medical treatment. On some occasions, defendant Blasius scheduled appointments for plaintiff even when he did not ask, in an effort make sure that his symptoms were not so severe as to impair his health. In addition, she continued the generic

22

version of the medicine plaintiff had been receiving at Dodge Correctional Institution.

Plaintiff received diagnostic testing in the form of stool sample analysis, blood count analysis and rectal exams. When defendant Blasius believed that a colonoscopy would be useful in determining the diagnosis of plaintiff's conditions, she continued to encourage plaintiff to undergo the procedure even when he consistently refused. When he finally agreed to it, the consulting doctors did both a colonoscopy and an endoscopy in an effort to pinpoint the source of the problems he was experiencing. The University of Wisconsin Hospital doctor who conducted the endoscopy and colonoscopy found inflammation and a hernia that explained plaintiff's symptoms and he recommended that plaintiff use proton pump inhibitor medicine, which is what defendants provided him.

Defendant Blasius would have known from plaintiff's medical records that health services staff had helped plaintiff secure the name-brand medicine he wanted for much of his stay at the Racine prison, despite the prison's policy of using only generic medicine when available, and that Dr. Luy had adjusted plaintiff's dosage (changing the time and manner he took Prilosec) when it appeared the medicine was not as effective as plaintiff wished and he gave plaintiff cetirizine to decrease his persistent drooling. When plaintiff complained that the cetirizine did not work, defendant Blasius prescribed sucralfate, a different form of acid-blocking medicine.

These are not the actions of deliberately indifferent medical providers. Petties, — F.3d —, 2015 WL 4567899, at *3 ("This meaningful and ongoing treatment of [plaintiff's] injury at [the prison] and with outside medical providers—which [defendant] oversaw—could

23

not constitute deliberate indifference."). Defendant Blasius and the rest of the health services staff made decisions using medical judgment. Duckworth v. Ahmad, 532 F.3d 675, 682 (7th Cir. 2008) ("[Defendant responded to [plaintiff's] continued complaints in a manner calculated to treat him."); Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner."). Perhaps the staff could have done even more to accommodate plaintiff; perhaps he would have been unhappy with any treatment. (After all, he went from demanding Prilosec to insisting it did not work, to demanding it once again.) In any event, defendant Blasius and the health services staff did not ignore plaintiff or treat him so inadequately or inappropriately as to have violated the Constitution. Id. at 592 ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'") (quoting Thomas v. Pate, 493 F.2d 151, 158 (7th Cir.1974), vacated and remanded on other grounds sub nom. Cannon v. Thomas, 419 U.S. 813 (1974)). See also Guzman v. Sheahan, 495 F.3d 852, 857 (7th Cir. 2007) ("Prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they 'responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.'") (quoting Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("[t]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.").

Indeed, defendant Blasius followed the protocol laid out by plaintiff's physicians. First, she continued plaintiff's prescriptions from Dodge Correctional Institution with the one exception that she gave him the generic version of Prilosec at first.  Plaintiff insists that he was approved to receive Prilosec at the Dodge prison and that defendant Blasius knew that but deprived him of it anyway.  Defendants do not dispute those allegations.  Rather, they point out, correctly, that the Eighth Amendment does not entitle plaintiff to the medical treatment of his choice.  Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997) ("[T]he Constitution is not a medical code that mandates specific medical treatment.") (quoting Snipes, 95 F.3d at 592).  Defendant Blasius followed prison procedure to provide generic versions of name-brand medicine.  Eventually, however, health services staff gave plaintiff the name-brand anyway, apparently in an effort to appease him.

Second, defendant Blasius followed the treatment plans laid out by Dr. Luy and the physician who had examined plaintiff at the University of Wisconsin Hospital, which were to provide plaintiff a proton pump inhibitor and an acid blocking medicine.  "[A] medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, [but] that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."  Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010).  Nothing about the physicians' treatment plans should have alerted Blasius that following those plans would put plaintiff at risk of harm.

It is true that defendants cannot persist in a treatment that is clearly not working. Gonzalez v. Feinerman, 663 F.3d 311, 314 (7th Cir. 2011) ("[P]hysicians [are] obligated not

25

to persist in ineffective treatment . . . . ").  Plaintiff might have argued that he sought assistance from defendants at such a high rate because the treatment he received was not effective.  However, in this case, the prison health services staff tried to work with plaintiff to ease his symptoms.   Any delays in treatment or exacerbation of symptoms can be attributed to plaintiff's own behavior, not to the indifference of medical staff.  Pinkston v. Madry, 440 F.3d 879, 892 (7th Cir. 2006) ("What's more, the record establishes that if anyone was indifferent to [plaintiff's] injuries, it was [plaintiff] himself. . . . [T]he record is replete with repeated instances of Pinkston being most uncooperative with medical staff and refusing medical assistance when it was offered to him, such as the various occasions on which he refused doctor-ordered x-rays to assist in determining whether or not any bones in his face had been broken.").

Plaintiff resisted nearly every measure defendants took to diagnose and treat his acid reflux.  He refused for months to undergo a colonoscopy; he refused routinely to undergo assessments and examinations at the prison; and he stopped taking his medicine at least two times.  (It appears that plaintiff refused at least some of his routine visits because he did not want to pay a copay of $7.50.  Plaintiff has not alleged that he was unable to pay or raised the issue of required copays as a claim in this lawsuit.)  Thus, even if defendants had refused to alter plaintiff's treatment plan, they would have had no reason to do so until he agreed to a colonoscopy: it is not deliberate indifference for prison officials to refuse to change treatments for a prisoner's condition until he submits to testing for that condition, so long as the condition appears to require testing for diagnosis.  Walker v. Peters, 233 F.3d 494,

26

500-01 (7th Cir. 2000) (doctors may refuse to treat plaintiff for HIV without violating Eighth Amendment when plaintiff refuses an HIV test).

In any event, it appears that plaintiff brought at least some of the pain he experienced upon himself. He bought food from the canteen that he knew would exacerbate his acid reflux and on at least some occasions he did not sleep in the position prescribed by health services staff or use the extra pillow provided him to keep his upper body raised. Plaintiff is free to refuse treatment or to exacerbate his condition by his own actions, but by doing so, he has undermined his Eighth Amendment claim.

In some instances prison medical staff may be required to force treatment on a prisoner if, for example the prisoner is incompetent, but this is not such an instance. Defendants may have suspected that plaintiff had some psychological problems because they ordered psychological appointments for him. Id. ("If there had been any evidence that the defendants were aware [plaintiff] was mentally ill and incompetent to make his own medical decisions, or perhaps suffering from AIDS-related dementia, for example, this might well be a different case."). Nevertheless, they ordered the psychological appointments not because they believed plaintiff was refusing treatment he needed but because, in their medical judgment, his demands for treatment did not match his physical presentations and might have a psychological origin. It would make little sense to say defendants should have forced treatment on plaintiff that was not necessarily what he needed. Perhaps defendants should have pushed harder to have plaintiff attend the psychological appointments. Even if that were true, it is beyond the scope of plaintiff's claims in this case, which involve his treatment

for acid reflux and hypertension.

This is not to make light of plaintiff's condition.  Acid reflux can be extremely painful and can have lasting and serious consequences.  Miller, — F.3d — , No. 14-1990, 2015 WL 4523799, at *2.  Nevertheless, medical providers cannot be expected to cure or ease the pain of patients who refuse to cooperate in their own care.  Defendants chose a treatment plan that may have dissatisfied plaintiff but that took into account his medical needs. Accordingly, I conclude that defendants have shown that they did not act with deliberate indifference to plaintiff's complaints of acid reflux.  Their motion for summary judgment will be granted as to this claim.


B.  Medical Care:  Hypertension

Plaintiff was also granted leave to proceed on claim that Nutting and Baker (both nurses) failed to provide him adequate treatment for hypertension.  As an initial matter, it is not clear whether plaintiff has abandoned this claim.  He makes only one brief reference to this claim in his summary judgment materials, saying that defendant Baker allowed him to go back to his cell after getting a high reading after taking his blood pressure. However, in his complaint, he set forth his claim as relating to receiving a "tab" version of his hypertension medicine, rather than a "capsule."  Plaintiff never explains what he means by this, whereas defendants adduced evidence that he received the same medicine for his hypertension throughout his stay at Racine, albeit in higher dosage at times,.  In any case, summary judgment must be granted for defendants on this claim.

28

Defendants do not deny that plaintiff's hypertension is a serious medical issue, Estelle, 429 U.S. at 104, or that he suffered migraine headaches as a result. Although medical staff at the Racine prison had their doubts about the connections between these two conditions, defendants have not raised this as an argument.

Even if I agree with plaintiff that his migraines were related to his hypertension and that they were serious medical issues, I cannot conclude that defendants Nutting and Baker were deliberately indifferent to plaintiff's medical condition. After he had taken plaintiff 60 mg of Nifedipine for several months and continued to complain of high blood pressure symptoms, Dr. Luy increased his dosage to 90 mg. Further, Dr. Luy prescribed another medicine, Metoprolol, to assist with plaintiff's hypertension symptoms. Dr. Luy and nurse practitioner Blasius provided plaintiff different medicines for his migraines as well, starting with Ibuprofen, then Excedrin, and finally adding Imitrex as well. Plaintiff was taken off these medicines only when he said they did not work and when medical staff determined that they would be detrimental to his acid reflux condition.

Such actions are responsive to plaintiff's conditions and are medical judgments, not an indication of deliberate indifference. Petties, — F.3d — , 2015 WL 4567899, at *3 ("This meaningful and ongoing treatment of [plaintiff's] injury at [the prison] . . . could not constitute deliberate indifference."). As nurses, defendants Nutting and Baker were entitled to defer to these judgments and follow them, in the absence of any evidence that the treatment provided plaintiff was likely to do him harm. Berry, 604 F.3d at 443.

Moreover, defendants Nutting and Baker assisted with the consistent monitoring of

29

plaintiff's blood pressure.  On all but one occasion when plaintiff had an elevated reading, he was monitored or provided a followup appointment (which he did not always accept).  In October 2013, he stopped taking his medicine but defendant Blasius continued to renew his prescription and encouraged him to take the medicine.

Plaintiff's medical providers were responsive and thorough in his diagnosis and care of his hypertension.  When he did experience an elevated reading, the health services staff responded quickly, even if the high reading could be attributed to his refusal to take his medicine or was an isolated event.  Jackson, 733 F.3d at 790; Peate, 294 F.3d at 882 (prison officials not liable if they "responded reasonably to the risk, even if the harm ultimately was not averted").  Having no reason to conclude that defendant Blasius or Dr. Luy might harm plaintiff by their treatment plan or neglect, defendants Nutting and Baker were entitled to follow Blasius's and Dr. Luy's medical judgments.  Berry, 604 F.3d at 443.  Accordingly, summary judgment must be granted in their favor.

### C.  Conditions of Confinement:  Soiled Linens

Under the Eighth Amendment, prisoners are guaranteed humane conditions of confinement for their health and safety.  Rice ex rel. Rice v. Corr. Med. Services, 675 F.3d 650, 664 (7th Cir. 2012) ("Incarcerated persons are entitled to confinement under humane conditions which provide for their 'basic human needs.'").  For example, prisoners must receive adequate food, clothing and shelter.  Farmer, 511 U.S. at 834.  A claim that a prisoner's conditions of confinement violate the Eighth Amendment requires plaintiff to

prove two things:  (1) the adverse condition is sufficiently serious and (2) the prison official has been deliberately indifferent to that condition.  <u>Rice</u>, 675 F.3d at 664-65.  For an adverse condition to be sufficiently serious, it must be "extreme," <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992), and it must deprive the prisoner of a "minimal civilized measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834.  Conditions that are "temporary inconveniences and discomforts" or that simply make prison "unpleasant" but are not unhealthy or unsanitary do not implicate the Eighth Amendment standard.  <u>Adams v. Pate</u>, 445 F.2d 105, 108, 109 (7th Cir. 1971).

Plaintiff alleges that he had dirty linens in his cell for months at a time and that defendants Wiegand and Howard would not allow him to get clean linens.  As an initial matter, plaintiff never explains how dirty the linens were.  Defendants Wiegand and Howard say they never saw any linens soaked in blood in his cell and that any liquid Howard saw was clear.  Thus, it is not clear that the linens posed a sufficiently severe adverse condition to plaintiff's confinement.  <u>Harris v. Fleming</u>, 839 F.2d 1232, 1235 (7th Cir.1988) (ten days without toilet paper, toothbrush or toothpaste in a "filthy, roach-infested cell" did not constitute cruel and unusual punishment).

Nevertheless, even if the linens were not unsanitary, plaintiff admits that the reason he could not get more linens is because he needed to wash his old ones.  Case no. 13-cv-681-bbc, dkt. #76, exh. #1, at 6; case no. 14-cv-224, dkt. #70, exh. #1, at 6.  He had access to the linen and towel exchange and to washing machines and sinks, all of which provided him means to obtain clean linens.  He simply chose not to take advantage of these opportunities,

wanting instead to keep a stack of old linens and towels rather than exchange or clean them.

Plaintiff has alleged no facts that explain how defendants interfered with his ability to clean linens on his own.  The lack of any such facts defeats this claim.  If defendants did not interfere with his own efforts to wash his linens, plaintiff has no Eighth Amendment claim against them.  Isby v. Clark, 100 F.3d 502, 506 (7th Cir. 1996) ("[A]n inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on."); Gates v. Cook, 376 F.3d 323, 342 (5th Cir. 2004) (no violation of Eighth Amendment when prisoners have access to sinks and bars of soap for washing their clothes); Smith v. Dart, No. 10 C 6395, 2013 WL 315742, at *9 (N.D. Ill. Jan. 28, 2013) ("As a general rule, where an inmate is the cause of the conditions about which he complains, any constitutional claim is rendered tenuous.").

It is true that "prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies," Rice, 675 F.3d at 665, but plaintiff has not alleged that he refused to wash his linens out of self-destructive behavior.  Absent a showing of severe psychological or physical inability, a plaintiff can be required to do his own laundy.  Moreover, prison officials may limit the clothing and other items a prisoner may possess at a given time.  Munson v. Gaetz, 673 F.3d 630, 638 (7th Cir. 2012) (prison may limit prisoner's access to certain items for legitimate penological purpose); Gates, 376 F.3d at 342 (no violation of Eighth Amendment for prison to require prisoners to do their own laundry).

ORDER

IT IS ORDERED that

1.   Plaintiff Jerome Anthony Theus's renewed motions for assistance in recruiting counsel, case no. 13-cv-681-bbc, dkt. ##80, 85; case no. 14-cv-224-bbc, dkt. ##74, 79, are DENIED.

2.   The motion for summary judgment filed by defendants Lisa Baker, Lora Blasius, Debbie Nutting, Susan Nygren, Michael Howard, Paul Kemper and Teresa Wiegand, case no. 13-cv-681-bbc, dkt. #64; case no. 14-cv-224-bbc, dkt. #58, is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 14th day of September, 2015.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

33